## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PATRICIA  THATCHER, | ) | |
| CARLY  PLAYFORD, and | ) | |
| BROOKE  SNODGRASS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-01115-TWP-TAB |
| | ) | |
| PERKINS, VAN NATTA, SANDOVE and | ) | |
| KELLY, MERDIAN PLASTIC SURGERY | ) | |
| CENTER, P.C., formerly known as PERKINS | ) | |
| FACIAL PLASTIC SURGERY CENTER AT | ) | |
| MERDIAN, P.C., and PERKINS-VAN | ) | |
| NATTA PLASTIC SURGERY, P.C., | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Perkins, Van Natta, Sandove and Kelly,

Meridian Plastic Surgery Center, P.C.'s ("the Practice") Motions for Summary Judgment.  The

Practice is seeking summary judgment on Plaintiff Carly Playford's ("Ms. Playford") Claims

(Dkt. 45), Plaintiff Brooke Snodgrass's ("Ms. Snodgrass") Claims (Dkt. 48), and Plaintiff

Patricia Thatcher's ("Ms. Thatcher") (collectively, "Plaintiffs") Claims (Dkt. 51) of employment

discrimination brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*[1]

("Title VII").  Further, the Practice asks the Court to remand Plaintiffs' claims brought under

Indiana state law, including invasion of privacy, infliction of emotional distress, commission of a

crime creating civil liability, negligent hiring, supervision and/or retention, and breach of duty to

---

[1] Plaintiffs' Amended Complaint  mentions in paragraph 1 that the action is also brought under the Civil Rights Act of 1991, 42 U.S.C. § 1981 (§ 1981).  Dkt. 9 at 1 ¶ 1.  However, § 1981 applies only to claims of racial discrimination, not gender. *Runyon v. McCrary*, 427 U.S. 160, 167 (1976).  The parties' only present arguments fall under Title VII, thus the Court will presume that this is a drafting error.  To the extent that Plaintiffs did intend to bring claims under § 1981, these claims are dismissed.

warn.   For the reasons set forth below, the Practice's motions (Dkts. 45, 48, and 51) are **GRANTED**.

## I.   BACKGROUND

**A.    The Practice**

The following material facts are not in dispute.[2]   Perkins, Van Natta, Sandove and Kelly, Meridian Plastic Surgery Center, P.C., formerly known as Perkins-Van Natta Plastic Surgery, P.C., is a plastic surgery medical practice, located in Indianapolis, Indiana that was owned by Dr. Stephen Perkins and Dr. Bruce Van Natta during the relevant time period.  The Practice operated an esthetics department, commonly referred to as Spa 170 West ("the Esthetics Department"), which provided skin care services including facials, laser resurfacing and hair removal, chemical peels, and pre- and post-operation makeovers.   Plaintiffs are all former employees of the Practice's Esthetics Department.

**1.    Ms. Thatcher's employment with the Practice**

Ms. Thatcher worked as the Esthetics Director for approximately four months, from October 2008 until she was terminated in February 2009.   As Esthetics Director, she was responsible for general oversight of the Esthetics Department, management of its staff, and marketing.  Ms. Thatcher generally worked Monday through Friday from 8:00 or 9:00 a.m. until 5:00 or 6:00 p.m.   She reported directly to Frank Bowles ("Mr. Bowles"), the Practice Administrator and supervisor of the Practice's employees, who reported to Dr. Perkins and Dr. Van Natta.   Ms. Thatcher typically saw Mr. Bowles at least once a day, and described her working relationship with him as "varied," noting that sometimes he was very nice and helpful,

---

[2] As discussed in further detail below, Plaintiffs failed to provide a Statement of Material Facts in Dispute section in their brief in opposition to the Practice's motions, as required by Local Rule 56-1(b).  Therefore, the Court will accept the facts as set forth by the Practice in accordance with Local Rule 56-1(f).

and other times he did not communicate well. She had limited interaction with Dr. Perkins and Dr. Van Natta, and described her relationship with both doctors as "fine."

The Practice claims there were issues with Ms. Thatcher's job performance throughout her employment, and they received complaints from patients and co-workers about Ms. Thatcher's lack of professionalism. For example, Ms. Thatcher attended the Practice's Christmas party in December 2008 where Dr. Van Natta observed that she appeared "excessively inebriated" and was swearing profusely. She then asked, in jest, "Oh, am I going to get fired?" She was also overheard referring to Dr. Perkins as "buddy" and admitted to referring to Dr. Amit Patel, another physician at the Practice, by his first name. In addition to her unprofessional behavior, Ms. Thatcher also had issues with timeliness and would occasionally arrive late for work or leave early.

Ms. Thatcher also failed to follow her supervisor's instructions, and they often disagreed about the management of the Esthetics Department. Mr. Bowles told Ms. Thatcher to develop a customer rewards program as a marketing initiative for the Esthetics Department, but she failed to do so. He attempted to schedule meetings with Ms. Thatcher in January and February 2009 to discuss her performance and behavior, but Ms. Thatcher never made herself available for these meetings. On February 18, 2009, Ms. Thatcher met with Dr. Van Natta and expressed concern that Mr. Bowles might terminate her employment because she had failed to follow his instructions to establish a rewards program, and complained that she had not had time to develop the rewards program as requested because she had been handling other issues within the Esthetics Department. Ms. Thatcher also told Dr. Van Natta that Mr. Bowles had mentioned to her that there was a camera in the makeup room. In response, Dr. Van Natta assured her that the Practice did not have a camera in the makeup room, as he had previously found and disconnected

the camera in January 2009, after another esthetician reported a similar concern.  Prior to this, Ms. Thatcher was not aware of the camera in the makeup room.

As a result of Ms. Thatcher's performance issues, Dr. Perkins and Dr. Van Natta, in consultation with Mr. Bowles, decided to end Ms. Thatcher's employment.  On February 23, 2009, Ms. Thatcher met with Mr. Bowles and Business Administrator Mary Anne Price.  Mr. Bowles informed her that the Practice had received complaints about her performance and thus had made the decision to terminate her employment.

### 2.     Ms. Playford's employment with the Practice

Ms. Playford began working as an Esthetics Coordinator at the Practice in August 2008, and voluntarily resigned in March 2009.  Ms. Playford admits that the decision to end her employment was her own; she was not told, asked, or forced to resign.  She considered the Practice to be a temporary place to work, that she had outgrown the position and was ready to move on.  Ms. Playford described her working relationship with her supervisors at the Practice as "normal", "great" and "pleasant".  Ms. Playford reported directly to Mr. Bowles, and described her working relationship with him as "friendly."  From late 2008 to early 2009, Ms. Playford also reported to Ms. Thatcher, and described their working relationship as "normal."  She also indirectly reported to Dr. Perkins and Dr. Van Natta, and had no complaints about her working relationship with either of them.

### 3.     Ms. Snodgrass's employment with the Practice

Ms. Snodgrass was hired by the Practice as an as-needed receptionist in January 2009.  In December 2008, Ms. Thatcher determined that the Esthetics Department needed assistance taking telephone calls and scheduling appointments on evenings and weekends.  Ms. Thatcher and Ms. Snodgrass had previously worked together, and Ms. Thatcher called Ms. Snodgrass

about her interest in an as-needed receptionist position with the Practice.  Ms. Snodgrass reported directly to Ms. Thatcher, who scheduled her to work as needed. After Ms. Thatcher was terminated, Ms. Snodgrass believes that Ms. Playford may have scheduled her to work, but she does not believe anyone else scheduled her to work after Ms. Playford resigned in March 2009. Ms. Snodgrass last worked for the Practice in April 2009, and had worked fewer than thirty total hours during her four months of active employment.  Since then, Ms. Snodgrass has not been scheduled to work because she was not needed.  The Practice never told her she was fired or that she should stop coming in.  Ms. Snodgrass said she had no problems with anyone at the Practice.

**B.      The Practice's Personnel Policies**

The Practice publishes personnel policies in its Personnel Policies Manual, and distributes the Personnel Policies Manual to each employee.  The Personal Policies Manual contains the Practice's Policy of Equal Employment Opportunity and Non-Discrimination, Drug Testing Policy, and Rules for Professional Conduct.  The Personnel Policies Manual prohibits discrimination, harassment, and unlawful retaliation and identifies procedures through which an employee may report alleged discrimination, harassment, or retaliation.  It instructs employees who believe that they have been subjected to inappropriate behavior to report the conduct immediately to their supervisor and/or any member of management that they feel comfortable with.  The Practice also offered annual training on these policies.  Ms. Playford, Ms. Snodgrass, and Ms. Thatcher each received a copy of the Practice's Personnel Policies Manual and signed an acknowledgment form confirming its receipt.

**C.      The Practice's Use of Security Cameras**

For many years, the Practice maintained live video monitors at various sites in its business that displayed live camera feeds from the building's three entrances.  The Practice

installed the system to ensure the safety of its employees and the security of the building; it allowed employees to see who was intending to enter the building, particularly after hours when the entrances were locked.  Approximately ten years ago, in response to apparent thefts of narcotics inventory, the Practice installed a second security system, consisting of a camera and a digital recorder, and focused the concealed camera on the locked narcotics cabinet in the surgery center.  Unlike the live cameras at the building's entrances, video from this camera fed into the recorder, and the video was only viewable through the use of particular software.  Mr. Bowles had the software on his laptop and desk top computer and was capable of viewing the recordings. By reviewing the video recording, the Practice had determined that a family member of the cleaning crew was unscrewing the hinges on the narcotics cabinet and stealing narcotic drugs after hours, resulting in conviction of the thief and termination of the drug losses.

In late 2007 and early 2008, the Practice began experiencing thefts in other areas of the building, including the employer-provided lunches from the kitchen and makeup from the makeup room.  The Practice again contracted with the security company to have two additional cameras installed, one in the kitchen and one in the makeup room.  The setup of the camera was supervised by Mr. Bowles.  Dr. Perkins and Dr. Van Natta approved the installation of the additional security cameras, but neither knew their exact location.  The camera in the makeup room was located in a ceiling mounted fire-detection device so as to be undetected to persons in the room.  Within weeks of the installation of the cameras, the system recorded an outside vendor taking food from the kitchen's refrigerator.  Mr. Bowles reviewed the video and showed a short clip to Dr. Perkins, and the Practice took appropriate action against the vendor. The Practice is not aware of any thefts of makeup after the installation of the camera in the makeup room.

In December 2008, the Practice began working with Pam Sanders ("Ms. Sanders"), owner of Sun Spray Tanning, to provide spray tans to the Esthetics Department employees and patients.  Ms. Sanders used a portable three-sided tent to spray tan her clients, and she set it up in various rooms, including the makeup room.  Ms. Snodgrass, Ms. Playford and Ms. Thatcher each received several spray tans in the makeup room during their employment with the Practice.  In addition, Ms. Playford and Ms. Thatcher had used the makeup room several times to change clothes, for pre-work and post-work fitness activities, and to apply makeup.  The surveillance camera was disconnected by Dr. Van Natta in January 2009, after another esthetician, Michelle Hughes, reported concerns about a camera being in the makeup room.

Ms. Playford did not learn about the camera in the makeup room until two months after she had resigned from the Practice.  On May 20, 2009, Ms. Playford visited another esthetician, Marianne Stephenson Rose, at her home, and Ms. Rose told her that the Practice had a camera in the Esthetics Department.  Ms. Snodgrass also did not learn about the camera until after she was no longer working at the Practice, as she was informed by Ms. Sanders in May 2009 that there may or may not have been a camera in the Practice's makeup room.  In November or December 2008, Ms. Thatcher first heard of video surveillance cameras being used at the Practice.  She was not made aware that a camera was in the makeup room until a day or two before she expressed her concerns to Dr. Van Natta on February 18, 2009, and by then the camera had been removed.  Additional facts will be provided below as necessary.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).   In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "In much the same way that a court is not required to scour the record in search of evidence to defeat the motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). "[N]either the mere existence of some alleged factual dispute between the parties . . . nor the existence of some metaphysical doubt as to the material facts . . . is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## III.   DISCUSSION

### A.    Failure to comply with Local Rule 56-1(b)

Local Rule 56-1(b) states that the non-movant's response "*must* include a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment."  S.D. Ind. Local R. 56-1(b) (emphasis added).    The Statement of Material Facts in Dispute is not an optional formality; rather, it is intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports the non-movant's position on each of these questions. *Waldridge v. Am. Hoechst Corp.*,

24 F.3d 918, 923 (7th Cir. 1994). Strict compliance with Local Rule 56-1 is expected and required. *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809 (7th Cir. 2005).

Local Rule 56-1(f) states that the court will assume that the facts as claimed and supported by the movant are admitted without controversy except to the extent that the non-movant specifically controverts the facts in its "Statement of Material Facts in Dispute." S.D. Ind. Local R. 56-1(f). The consequence of the non-movant's failure to include a Statement of Material Facts in Dispute as mandated by the local rules results in an admission of the facts as set forth by the moving party. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). "[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Id.* "[W]ithout [a Statement of Material Facts in Dispute] the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own." *Waldridge*, 24 F.3d at 923. "[I]n imposing a penalty for a litigant's non-compliance with Local Rule [56-1], the court [may choose] to ignore and not consider the additional facts that a litigant has proposed." *Cichon*, 401 F.3d at at 810.

Plaintiffs' brief does not include a "Statement of Material Facts in Dispute" section as required by Local Rule 56-1(b). Plaintiffs only set forth an additional Statement of Facts in which they do not clearly identify which material facts are in dispute that would preclude summary judgment on each of their claims. Dkt. 57 at 2-7. The Court is not required undertake the exercise of combing through Plaintiffs' statement of facts to identify discrepancies between their version of the facts and the facts as presented by the Practice. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). *.").* Although Plaintiffs have failed to comply with Local Rule 56-1(b), the Court has scoured the record, as best able, in an attempt to determine Plaintiff's statements of material facts

9

in dispute. Where unable to make such a determination, the Court has accepted the Practice's statement of facts as true for purposes of this motion in accordance with Local Rule 56-1(f).[3]

**B.     Title VII Claims**

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  The Plaintiffs claim that they were subject to sexual harassment based upon the presence of the surveillance camera in the makeup room, and retaliation for their complaints about the surveillance camera.

**1.     Hostile Work Environment Sex Discrimination Claims**

The Plaintiffs' Amended Complaint states that the Plaintiffs are bringing claims for "sex discrimination and/or sexual harassment."  Dkt. 9 at 6, ¶ 29.  The Supreme Court has held that a claim of hostile environment sexual harassment is a form of sex discrimination actionable under Title VII.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).  Plaintiffs only address hostile work environment sex discrimination related to the presence of the camera in the makeup room in their response brief, and do not address the Practice's arguments regarding disparate treatment discrimination.  Thus, the Court will address the Plaintiffs' sex discrimination claims as ones for sexual harassment related to the installation of the surveillance camera in the makeup room, and to the extent that the Plaintiffs do assert disparate treatment claims in their Amended Complaint, the Court deems them waived.

---

[3] Plaintiffs argue that the Practice's summary judgment motions should be denied as a sanction for its spoliation of evidence under Federal Rule of Civil Procedure 37(b)(2)(A) for failure to produce the original hard drive from the digital recorder.  However, the Court and the parties already agreed that the Plaintiffs did not need the video or the related expert report to address the Practice's summary judgment motions. Dkt. 43 at 2.  Any dispute regarding the video evidence is inapplicable to these motions, so the sanction of dismissal under Rule 37 would not be appropriate.

In order to prevail on a hostile work environment claim, the Plaintiffs must show that the conduct at issue "was both subjectively and objectively so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004) (quotations omitted). "'[R]elatively isolated' instances of non-severe misconduct will not support a hostile environment claim." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993) (quoting *Weiss v. Coca-Cola Bottling Co. of Chi.*, 990 F.2d 333, 337 (7th Cir. 1993)). The standards used to evaluate sexual harassment are the same as those used for racial harassment claims. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002).

To survive summary judgment on a hostile work environment claim, each Plaintiff must provide sufficient evidence to create a material issue of fact as to four elements: (1) the work environment was both subjectively and objectively offensive; (2) her gender was the basis for the harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for the Practice's liability. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). When evaluating a hostile work environment claim, courts will not focus on discrete acts of individual employees, but must consider the entire context of the workplace. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). Not all workplace unpleasantries give rise to liability under federal civil rights laws, which do not guarantee a perfect work environment. *Vore v. Ind. Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994).

### a.      Ms. Playford's and Ms. Snodgrass's sexual harassment claims

Plaintiffs do not present any arguments that Ms. Playford and Ms. Snodgrass satisfy any of the elements of the *prima facie* case on their sexual harassment claims. By its nature, surreptitious surveillance is invasive; however, Ms. Playford and Ms. Snodgrass only argue that

the conduct was objectively offensive, and do not cite to any evidence in the record to support this argument. Regardless, Ms. Playford's and Ms. Snodgrass's sexual harassment claims must fail because neither can satisfy the first prong of her *prima facie* case. Neither Ms. Playford nor Ms. Snodgrass had any knowledge about the surveillance camera in the makeup room during their employment with the Practice, and only learned of it after their employment had ceased. Behavior of which a plaintiff is not aware cannot render the workplace hostile, because the plaintiff cannot show that the conduct was both objectively *and* subjectively offensive. "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris v. Forklift Systems, Inc.*, 501 U.S. 17, 21-22 (1993).

The Plaintiffs argue that this case is similar to another "peeping tom" case, *Ciesielski v. Hooters of Am., Inc.*, No. 03-C-1175, 2004 WL 1699020 (N.D. Ill. July 28, 2004). In *Ciesielski*, the plaintiff sued her former employer for sexual harassment, alleging that, while she was changing from her street clothes into her work uniform in a changing room that was adjacent to the employee break room, she observed a hole in the wall and felt as though someone were watching her. The employer patched the hole, but the plaintiff soon observed a second set of holes in the changing room wall. The plaintiff reported the reappearance of the holes to her employer, who once again patched them. Several months later, the plaintiff noticed a third set of holes in the wall, and, again, reported them to her employer. This time, the employer installed paneling on both sides of the wall. The court denied the employer's summary judgment motion, noting that the "[p]laintiff was aware of the appearance and recurrence of the holes in the changing room wall, that she suspected that the holes were used for peeping purposes, and that she was upset that additional holes appeared after the original holes were patched." *Id.* at *5.

Although the plaintiff did not know whether someone actually watched her changing and she did not know who created the holes, the court determined that a reasonable jury could find that these circumstances contributed to a hostile work environment.  *Id.  See also Liberti v. Walt Disney World Co.*, 912 F. Supp. 1494, 1505 (M.D. Fla. 1995) (denying summary judgment as to hostile work environment claim where plaintiffs knew that holes existed in a dressing room wall and that additional holes appeared, and where plaintiffs did not know whether anyone actually peeped through the holes).

Ms. Playford's and Ms. Snodgrass's claims are distinguishable from the plaintiff's claim in *Ciesielski*.  In *Ciesielski*, the plaintiff was upset by the reappearance of the holes in the changing room wall, which she suspected were being used for peeping activities.  Although she was not aware of who may have actually been viewing her through the holes, if anyone, it was the repeated reappearance of the holes in the wall that the court found created a sufficient question of fact for the jury as to whether the activity altered the plaintiff's working environment while she was still employed by the defendant.  In this case, Ms. Playford and Ms. Snodgrass had no knowledge whatsoever of the existence of the camera in the makeup room, so there is no way that its existence could have altered their work environment while they were working for the Practice.  While the possibility of unknowingly being viewed in various states of undress may be objectively offensive, that alone still does not satisfy the requirement that the victim herself also be aware the activities and subjectively perceive the environment as offensive.  Because neither Ms. Playford nor Ms. Snodgrass can show that there is a question of material fact as to the first prong of her *prima facie* case, the Practice's motions for summary judgment on Ms. Playford's and Ms. Snodgrass's sexual harassment claims are **GRANTED**.

### b.     Ms. Thatcher's sexual harassment claim

Similarly, Ms. Thatcher fails to make any arguments that can satisfy the elements of her *prima facie* case on her sexual harassment claim, aside from the argument that surreptitious video recording of females in a dressing room is objectively offensive.  Her sexual harassment claim also fails for failure to satisfy the elements of her *prima facie* case.  Unlike Ms. Playford and Ms. Snodgrass, Ms. Thatcher, at some point during her employment at the Practice, did become aware of the existence of a camera in the makeup room; however, this was only during the last four days of her employment.  Additionally, the Practice states that the camera was disconnected in January 2009, a month before Ms. Thatcher became aware of its presence, a fact which the Plaintiffs do not dispute.  The activity that Plaintiffs claim is offensive—the surreptitious video recording of females in states of undress—ceased prior to Ms. Thatcher being made aware of its occurrence.  Thus, Ms. Thatcher's sexual harassment claim fails for the same reason that Ms. Playford's and Ms. Snodgrass's claims fail, namely that she was unaware of the alleged harassing behavior at the time it occurred, and only learned about it after the fact.  Ms. Thatcher does not present any evidence that this knowledge subjectively altered her work environment during her employment with the Practice.

Even if the Court were to assume that the inappropriate conduct did rise to the level of actionable harassment under Title VII, Ms. Thatcher's sexual harassment claim still fails for the additional reason that she cannot show that there is a basis for holding the Practice liable for the conduct.  Ms. Thatcher argues that the *Ellerth/Fargaher* affirmative defense has no application in this case because the action was authorized by management; however, this is only a partial and incorrect application of the *Ellerth/Fargaher* rule.

In *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Fargaher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court established the rules for employer liability when the harassing individual is a supervisor. *Jackson v. Cnty. of Racine*, 474 F.3d 493, 500-01 (7th Cir. 2007). In cases in which the supervisor's harassment resulted in a tangible employment action, such as discharge, demotion, or undesirable reassignment, the employer's vicarious liability is strict, and no defense is available. *Id.* at 501. However, if the harassment is not accompanied by, or does not result in, any tangible employment action, then the employer may assert an affirmative defense by showing "a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* (quoting *Ellerth*, 524 U.S. at 765). Ms. Thatcher does not assert that the Practice took any tangible employment action against her as a result of the alleged harassment. While Ms. Thatcher was eventually terminated by the Practice, Ms. Thatcher only argues that she was terminated in retaliation for complaining about the presence of the camera. Ms. Thatcher asserts that the consumption of alcohol and use of profanity was not unusual, there was no deadline for her to implement the rewards program, and no one ever brought a performance issue to her attention prior to her termination. However, the Practice asserts, and Ms. Thatcher does not dispute, that poor performance led to her termination. She does not dispute that she was sometimes tardy or absent, that she consumed alcohol at work functions, and other unprofessional conduct, or that she failed to implement the reward program. Further, there is no evidence that her termination was a result of the alleged harassment itself. Therefore, the Practice is entitled to assert an *Ellerth/Fargaher* defense.

The undisputed evidence demonstrates that the Practice exercised reasonable care to prevent and promptly correct any allegedly inappropriate behavior.  In response to a nearly identical concern expressed earlier by esthetician Michelle Hughes in January 2009, Dr. Van Natta immediately investigated, found the camera, and promptly disconnected it.  Although Ms. Thatcher expressed that she believed that she first heard about the possibility of cameras being in the makeup room in November 2008 (Dkt. 53-1 at 28, 120:8-14), she did not report her concern to the Practice until her meeting with Dr. Van Natta on February 18, 2009.  The Practice cannot be held liable for allegedly harassing conduct of which it was not made aware.  *Durkin v. City of Chi.*, 341 F3d 606, 612 (7th Cir. 2003).  Additionally, despite suspecting that there may have been a camera in the makeup room, Ms. Thatcher continued to use the makeup room to receive spray tans.  Dkt. 53-1 at 32, 136:11-16.  This evidence shows that Ms. Thatcher failed to avail herself of reporting procedures by informing the Practice of allegedly inappropriate activities, and also failed to avoid harm by utilizing the room in states of undress despite suspecting that there was a surveillance camera present.  Thus, the Practice has demonstrated that there is no basis for its liability, and the Practice's motion for summary judgment on Ms. Thatcher's sexual harassment claim is **GRANTED**.

## 2. Retaliation Claims

Plaintiffs next assert claims against the Practice for retaliation.  Title VII prohibits an employer from acting in retaliation against employees who lawfully seek to or actually do participate in the process of investigating or pursuing a Title VII discrimination claim.  42 U.S.C. §2000e-3(a).  A plaintiff may establish a *prima facie* case of retaliation using either the direct or indirect method.  *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 642 (7th Cir. 2002).  Under the direct method, the plaintiff must present direct evidence of (1) a statutorily protected

activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. *Id.* at 644. Under the indirect method, the plaintiff must show that (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in a statutorily protected activity. *Id.*; *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003). Under this method, once the plaintiff establishes these elements, the burden shifts to the defendant to come forward with a legitimate reason for the adverse employment action. *Haywood*, 323 F.3d at 531. Once the defendant presents a legitimate, non-invidious reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual. *Id.*

### a.   Ms. Snodgrass's retaliation claim

Ms. Snodgrass does not present any arguments or evidence to prove the elements of her *prima facie* case under the direct method of proof, nor does she present any arguments that she can satisfy all of the elements of her *prima facie* case under the indirect method of proof. She only addresses the issue of pretext and whether she suffered an adverse employment action, and ignores other aspects of the analysis to prove her *prima facie* case. However, Ms. Snodgrass's claim fails on the first prong under both methods of proof because she has not shown that she engaged in a statutorily protected activity while she was actively working at the Practice. A "statutorily protected activity" is the act of opposing or complaining about discriminating treatment in the workplace, or participating in an investigation of discriminatory treatment. *See* 42 U.S.C. § 2000e-3(a). Ms. Snodgrass admitted in her deposition testimony that she never made any complaints to anyone at the Practice about surveillance cameras. Dkt. 50-1 at 12,

17

42:3-18.  "[A]n employer cannot retaliate when it is unaware of any complaints."  *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000).  Ms. Snodgrass's filing of a complaint with the Equal Employment Opportunity Commission ("EEOC") is arguably protected activity; however, she did not file this complaint until August 2009, four months after the date she last worked for the Practice.

Even if the Court were to accept that the filing of the EEOC complaint was a statutorily protected activity under the Title VII analysis, Ms. Snodgrass still cannot show that retaliation resulted from this activity.  Ms. Snodgrass argues that the Practice retaliated against her in two ways.  First, she argues that the Practice stopped scheduling her to work, and second the Practice discontinued scheduling her for cancer-related medical treatment previously provided by Dr. Sandove.  However, the Practice had already stopped scheduling Ms. Snodgrass to work several months prior to her filing an EEOC complaint. Ms. Snodgrass last worked with the Practice in April 2009, four months before she filed her EEOC complaint.  "It is axiomatic that a plaintiff engage in statutorily protected activity *before* an employer can retaliate against her for engaging in statutorily protected activity."  *Durkin*, 341 F.3d at 614-15 (emphasis added).  Because the Practice ceased scheduling Ms. Snodgrass months prior to her EEOC charge, she has not shown that the decision not to schedule her was a result of her protected activity.

With regard to the cessation termination of Ms. Snodgrass's cancer-related medical appointments, this action is too unrelated to Ms. Snodgrass's employment to constitute an adverse employment action.  While Title VII does also protect former employees against retaliation, former employees may only hold their former employers liable for retaliation that impinges on their future employment prospects or otherwise has a nexus to employment. *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 (7th Cir. 1996).  The claims of former

18

employees are inactionable when they are unrelated to the plaintiff's employment. *Id.* Ms. Snodgrass's medical treatments are in no way related to her employment, either past or future, as she had been seeing Dr. Sandove since she was two years old. Further, Ms. Snodgrass has not shown that Dr. Sandove's inaction in scheduling appointments had anything to do with her filing an EEOC claim or filing this lawsuit, and Ms. Snodgrass herself has not contacted the doctor to schedule an appointment. Ms. Snodgrass has not shown that she engaged in a statutorily protected activity or that she suffered an adverse employment action; therefore, the Court **GRANTS** the Practice's motion for summary judgment on Ms. Snodgrass's retaliation claim.

### b.     Ms. Playford's retaliation claim

Ms. Playford claims the Practice retaliated against her by interfering with her prospective employment with Hoffacker Fitness because of her "expression of opposition." Dkt. 57 at 18. Ms. Playford also does not argue that she satisfies the elements of her *prima facie* case using either the direct or indirect methods. Her retaliation claim fails because Ms. Playford has not shown that she actually engaged in any statutorily protected activity. Ms. Playford stated in her deposition that she reported her knowledge about the cameras to the Practice's spray tan contractor, Pam Sanders, and this is what she believed caused the Practice to retaliate against her. Dkt. 47-1 at 36, 154:1-155:3. Her complaint to Ms. Sanders does not constitute protected activity because the complaint was not made to Ms. Playford's employer, thus the Practice could not retaliate against her for it. *See Miller*, 203 F.3d at 1008. Because Ms. Playford has not shown that she engaged in any statutorily protected activity, her claim for retaliation fails.

Furthermore, Ms. Playford's claim fails for the additional reason that she cannot show that she suffered an adverse employment action. Although in her Amended Complaint Ms. Playford claims that she was constructively discharged, the evidence shows, and Ms. Playford

admits, that she voluntarily resigned prior to learning about the existence of the surveillance cameras and prior to sharing this information with Ms. Sanders.  Ms. Playford argues that the Practice retaliated against her after she resigned by interfering with her prospective employment with Hoffacker Fitness.  However, she has presented no admissible evidence that her failure to secure employment with Hoffacker Fitness bore any relationship to her cursory[4] complaints about the camera in the makeup room.

Ms. Playford attempts to show that the Practice retaliated against her by mentioning, but not citing to, emails between her counsel and the Practice's prior counsel, in which she claims that the Practice "actively menaced Ms. Playford with legal action" which interfered with her employment with Hoffacker Fitness.  Dkts. 57 at 18, 57-6, 57-7, and 57-8.  However, these e-mails are inadmissible as evidence to prove the Practice's liability under Federal Rule of Evidence 408, as they are communications made in compromise negotiations. The e-mails clearly indicate that they are "Rule 408 Confidential Compromise Communications" and were exchanged in attempt to settle the parties' disputes prior to filing formal legal action.  Ms. Playford cites to no other evidence that would indicate that she suffered an adverse employment action resulting from the Practice's conduct.  Therefore, because the Court finds that Ms. Playford did not engage in a statutorily protected activity and did not suffer an adverse employment action, the Practice's motion for summary judgment on Ms. Playford's retaliation claim is **GRANTED**.

### c.      Ms. Thatcher's retaliation claim

Ms. Thatcher presumably attempts to proceed under the direct method of proof, as she does not argue the elements of her *prima facie* case under the indirect method.  As previously

---

[4] In her deposition, Ms. Playford testified her conversation with Mr. Hoffacker was "very, very brief" and her complaint regarding Defendants was that there was "possibly" or "could be a camera" in one of the treatment rooms. There was no conversation or complaint regarding sex or gender discrimination.

stated, Ms. Thatcher must show that she engaged in activity protected by Title VII; the Practice took an adverse employment action against her; and there was a causal connection between the protected activity and the adverse employment action. *Coleman*, 667 F.3d at 859. For purposes of summary judgment, the parties do not dispute that Ms. Thatcher engaged in protected activity when she complained to Dr. Van Natta about the camera, nor do they dispute that Ms. Thatcher suffered an adverse employment action when the Practice terminated her employment, thus satisfying the first and second prongs under the direct method. The parties only dispute whether Ms. Thatcher has satisfied the causation element under the direct method.

A plaintiff can show causation by showing that engaging in protected activity was the "substantial or motivating factor" in the employer's decision to terminate her. *Id.* (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008)). This may be done via direct evidence, which would entail something akin to an admission by the employer that the termination was because of the complaint, or by presenting a "convincing mosaic" of circumstantial evidence that would permit the inference without the employer's admission. *Coleman*, 667 F.3d at 860. One of the methods that the Seventh Circuit has identified to show this "convincing mosaic" is by showing "suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which an inference of [retaliatory] intent might be drawn." *Id.* (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011) (additional citations omitted)).

Ms. Thatcher argues that suspicious timing alone substantiates her claim and precludes summary judgment on her retaliation claim due to the close temporal proximity of two business days between her complaint and her termination. "Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is other evidence that supports the inference of a causal link." *Scaife v. Cook Cnty.*, 446 F.3d 735, 742

(7th Cir. 2006) (quoting *Lang v. Ill. Dept. of Children & Family Svcs.*, 361 F.3d 416, 419 (7th Cir. 2004)). However, "[o]n summary judgment, in particular, 'it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact.'" *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (quoting *Wyninger*, 361 F.3d at 981).

Ms. Thatcher argues that in her meeting with Dr. Van Natta two business days prior to her termination, he assured her that she had nothing to worry about job-wise; however, she does not cite to any admissible evidence to support this assertion. Dkt. 57 at 15. The Practice cites to evidence, which Ms. Thatcher does not dispute, that one of the reasons that Ms. Thatcher went to speak with Dr. Van Natta was because she was already concerned that she would be terminated by Mr. Bowles due to deficiencies in her performance, specifically that she had failed to implement a customer rewards program. Dkt. 53-1 at 38, 166:15-24. Ms. Thatcher already knew her job was possibly in jeopardy prior to making her complaint, and "an employee's complaint of harassment does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002).

In addition, the Practice asserts that Ms. Thatcher cannot show that Dr. Van Natta shared her complaints about the camera with Mr. Bowles prior to her termination such that it influenced his decision to recommend that the Practice terminate her employment. "The critical issue . . . is whether the person who made the decision to terminate [the employee's] employment was aware of the discrimination allegations at the time, because absent such knowledge [the employee] lacks a causal link between the termination and the complaint of discrimination." *Maarouf v. Walker Mfg. Co., Div. of Tenneco Auto., Inc.*, 210 F.3d 750, 755 (7th Cir. 2000). Ms. Thatcher does not argue or present evidence that Mr. Bowles was aware of her complaint about the

camera, and instead focuses on Dr. Van Natta's assurances that her job was not in jeopardy, despite the fact that Dr. Van Natta was not Ms. Thatcher's direct supervisor.

The fact that Ms. Thatcher was already concerned about her job prior to making a complaint about the camera to Dr. Van Natta, and the fact that Ms. Thatcher does not dispute that this complaint was not shared with Mr. Bowles, does not provide sufficient evidence to support the inference that the temporal proximity between her complaint and her termination supports an inference of causation as a matter of law.  Ms. Thatcher has failed to present a "convincing mosaic" of admissible circumstantial evidence required to prove causation and to state a *prima facie* case of retaliation under the direct method.  Therefore, summary judgment is **GRANTED** in favor of the Practice on Ms. Thatcher's retaliation claim.

C.      **State Law Claims**

The parties request that if the Court grants all of the Practice's motions for summary judgment on Plaintiffs' Title VII claims, it should remand the Plaintiffs' state law claims under Counts III, IV, V, VI and VII of their Amended Complaint (Dkt. 9) to the Hamilton Superior Court. The Court agrees.  "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."  *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).   Ms. Playford and Ms. Thatcher, along with Ms. Sanders, already have identical claims pending against the Practice in the Hamilton Superior Court as part of a class action invasion of privacy case, of which Ms. Snodgrass is a putative class member, so remanding the state law claims in this case is particularly appropriate under these circumstances.  The Court therefore **GRANTS** the Practice's motion to dismiss the Plaintiffs' state law claims without prejudice.

## IV.   **CONCLUSION**

While the Court recognizes the seriousness of the accusations that Plaintiffs have brought against the Practice related to the alleged secret recording of them in their most vulnerable states, the Plaintiffs cannot show that the Practice's actions meet the standards for finding that a Title VII violation has occurred.  Nevertheless, Plaintiffs still have the opportunity to pursue their state law claims against the Practice in state court.  The Court therefore **GRANTS** the Practice's Motions for Summary Judgment on Plaintiff Carly Playford's Claims (Dkt. 45), Plaintiff Brooke Snodgrass's Claims (Dkt. 48), and Plaintiff Patricia Thatcher's Claims (Dkt. 51), and hereby **DISMISSES with prejudice** Count I and II of Plaintiffs' Amended Complaint (Dkt. 9), and **DISMISSES without prejudice** Counts III, IV, V, VI and VII of Plaintiffs' Amended Complaint (Dkt. 9).   The final pretrial conference set July 24, 2013 and the jury trial set August 12, 2013 are **VACATED**.  Within seven days parties shall confer and submit a proposed final judgment regarding disposition and remand.

The Court **GRANTS** the law firm of Robert W. York & Associates Motion to Withdraw as Attorneys for Carly Miller Playford (Dkt. 103), as new counsel has entered an appearance on Ms. Playford's behalf. The July 3, 2013 deadline in Dkt. 106 is moot.

Further, the pending Motions in Dkts. 68, 83, 86 and 97 are **DENIED** as Moot.

**SO ORDERED**.

Date: _____
06/28/2013

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Shana C. Stump
FAEGRE BAKER DANIELS LLP - Indianapolis
shana.stump@faegrebd.com

Amanda L. Shelby
FAEGRE BAKER DANIELS LLP - Indianapolis
amanda.shelby@faegrebd.com

David K. Herzog
FAEGRE BAKER DANIELS LLP - Indianapolis
david.herzog@faegrebd.com

Edward E. Hollis
FAEGRE BAKER DANIELS LLP - Indianapolis
edward.hollis@faegrebd.com

Sarah  Jenkins
FAEGRE BAKER DANIELS LLP - Indianapolis
sarah.jenkins@faegrebd.com

James D. Masur, II
ROBERT W. YORK & ASSOCIATES
jmasur@york-law.com

Robert W. York
ROBET W. YORK & ASSOCIATES
rwyork@york-law.com